**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LISA GRENIER, Derivatively On Behalf Of VIRGIN GALACTIC HOLDINGS, INC., | Case No.:   22-1100 |
| Plaintiff, | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |
| v. | |
| RICHARD BRANSON, CHAMATH PALIHAPITIYA, MICHAEL MOSES, GEORGE WHITESIDES, MICHAEL COLGLAZIER, WANDA AUSTIN, ADAM BAIN, TINA JONAS, CRAIG KREEGER, EVAN LOVELL, GEORGE MATTSON, JAMES RYANS, W. GILBERT WEST, ANTHONY BATES, IAN OSBORNE, JACQUELINE D. RESES, AND ANDREA WONG, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| VIRGIN GALACTIC HOLDINGS, INC., | |
| Nominal Defendant. | |

Plaintiff Lisa Grenier ("Plaintiff"), by and through her undersigned counsel, derivatively on behalf of Nominal Defendant Virgin Galactic Holdings, Inc. ("Virgin Galactic" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon her personal knowledge as to herself and her own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Virgin Galactic with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Defendants (defined below) from July 10, 2019 through October 14, 2021 (the "Relevant Period").

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

3.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

4.      This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

5.      Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

**Plaintiff**

6.      Plaintiff purchased shares of Virgin Galactic stock during the affected time and continues to hold his Virgin Galactic stock currently.

**Nominal Defendant Virgin Galactic**

7.      Virgin Galactic is a Delaware corporation with its principal executive offices at 166 North Roadrunner Parkway, Suite 1C, Las Cruces, New Mexico.  Virgin Galactic common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "SPCE."

**Defendants**

2

8.      **Defendant Richard Branson** ("Branson") is one of Legacy VG's[1] founders and the owner of the "Virgin" brand.  According to a Form 8-K filed by SCH[2] with the SEC on October 29, 2019, upon the consummation of the Merger, Defendant Branson had control over 114,790,438 shares of Virgin Galactic's common stock, or 58.7%, through subsidiaries of Virgin Group Holdings Limited.  This ownership made him a controlling shareholder of the Company during the Relevant Period.  During the Relevant Period, when the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Branson sold 10.4 million shares for $300.9 million in proceeds.

9.      **Defendant Chamath Palihapitiya** ("Palihapitiya") served as the Chairperson of the Company's Board from October 2019 until February 17, 2022, when he resigned both as Chairperson and as a director.  During the Relevant Period, when the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Palihapitiya sold 10,000,000 shares on inside information for which he received approximately $315 million in proceed.

10.      **Defendant Michael Moses** ("Moses") has served as President of Space Missions and Safety of Galactic Enterprises—a wholly owned subsidiary of the Company—since June 2016.  Prior to this, from October 2011 until June 2016, he served as Galactic Enterprises' Vice-President of Operations.

11.      **Defendant George Whitesides** ("Whitesides") served as Chief Space Officer and from July 2020 until February 2021, when he left the Company.  Prior to this, he served as CEO

---

[1]      Prior to the merger discussed herein, Vieco 10 Limited ("Vieco") was the holding company that held Virgin Galactic Vehicle Holdings, Inc. and other affiliated subsidiaries (collectively, "Legacy VG") that served as the operational predecessor of Virgin Galactic.  Vieco owned Legacy VG through its subsidiary, Vieco USA, Inc. ("Vieco US").

[2]      Virgin Galactic Holdings, Inc. ("Virgin Galactic" or the "Company") f/k/a Social Capital Hedosophia Holdings Corp. ("SCH" or the "Company").  "Virgin Galactic" refers to the "Company" after the October 2019 merger (the "Merger") and name change, whereas "SCH" refers to the "Company" prior to the Merger and name change.

and a director of the Company from the Merger until July 2020.

12.     **Defendant Michael Colglazier** ("Colglazier") has served as CEO of the Company and as a director since July 2020.

13.     **Defendant Wanda Austin** ("Austin") has served as a Company director since October 2019.  Defendant Austin also serves as Chairperson of the Compensation Committee and a member of both the Audit Committee and Safety Committee.

14.     **Defendant Adam Bain** ("Bain") has served as a Company director since the Merger in October 2019 and prior to this was an SCH director since September 2017. Defendant Bain also serves as Chairperson of the Nominating and Corporate Governance Committee and a member of the Compensation Committee.

15.     **Defendant Tina Jonas** ("Jonas") has served as a Company director since June 2021.  Defendant Jonas also serves a member of the Audit Committee.

16.     **Defendant Craig Kreeger** ("Kreeger") has served as a Company director since the Merger in October 2019. In addition, Defendant Kreeger serves as Chairperson of the Safety Committee and as a member of the Audit Committee.  During the Relevant Period, when the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Kreeger sold 10,000 shares of Company stock for proceeds of $251,500.

17.     **Defendant Evan Lovell** ("Lovell") has served as a Company director since the Merger in October 2019.  Defendant Lovell was appointed Interim Chairperson following Defendant Palihapitiya's resignation on February 17, 2022.  In addition, Defendant Lovell serves as a member of the Safety Committee.

18.     **Defendant George Mattson** ("Mattson") has served as a Company director since the Merger in October 2019.  In addition, Defendant Mattson serves as Chairperson of the Audit

Committee and as a member of both the Compensation Committee and the Nominating and Corporate Governance Committee

19.     **Defendant James Ryans** ("Ryans") served as a Company director from the Merger in October 2019 until February 2021 when he stepped down.  Defendant Ryans was also an SCH director from February 2018 until the Merger.  During part of the Relevant Period, Defendant Ryans served as Chairperson of the Audit Committee and as a member of the Nominating and Governance Committee.

20.     **Defendant W. Gilbert West** ("West") has served as a Company director since February 2021.  Defendant West also serves as a member of the Safety Committee.

21.     **Defendant Anthony Bates** ("Bates") served as Vice Chairman of SCH's Board from May 2017 until the Merger.

22.     **Defendant Ian Osborne** ("Osborne") served as President of SCH and a member of its Board from May 2017 until the Merger.

23.     **Defendant Jacqueline D. Reses** ("Reses") served as an SCH director from February 2018 until the Merger.

24.     **Defendant Andrea Wong** ("Wong") served as an SCH director from September 2017 until the Merger.

25.     Defendants Branson, Palihapitiya, Moses, Whitesides, Colglazier, Austin, Bain, Jonas, Kreeger, Lovell, Mattson, Ryans, West, Bates, Osborne, Reses and Wong are collectively referred to herein as the "Defendants".

## **BACKGROUND**

26.     The Company is an aerospace company that is a pioneer space travel for private individuals and researchers.  The Company conducts space flights and manufactures space-faring

vehicles and components.

27.    Defendant Branson is the owner of the "Virgin" brand.

28.    Social Capital Hedosophia Holdings Corp. ("SCH"), which is now known as Virgin Galactic, was founded as a special purpose acquisition company ("SPAC") in 2017. On September 18, 2017, SCH's initial public offering closed and then it began the process of looking for a company to merge with.

29.    Prior to the Merger, Vieco 10 Limited ("Vieco") was the holding company that held Virgin Galactic and other affiliated subsidiaries (collectively, "Legacy VG"). Vieco owned Legacy VG through its subsidiary, Vieco USA, Inc. ("Vieco US").

30.    Prior to the Relevant Period, Legacy VG developed designs for two prototype aerospace vehicles: Eve and Unity. These vehicles and their design drawings were severely flawed.

31.    Eve is an aircraft that flies to approximately 45,000 feet above the Earth before releasing Unity, which then ignites its own rockets to complete the journey into space. Prior to the merger, Eve and Unity had conducted two test flights into space.

32.    While Legacy VG promoted its spaceflights as a successes; in fact, Eve and Unity were very rudimentary prototypes. In short, both Eve and Unity lacked key engineering documentation and some existing documentation did not accurately depict the existing prototypes' designs.

33.    On July 9, 2019, SCH and Vieco issued a joint press release reporting the merger that would form Virgin Galactic.

34.    While Defendants (defined herein) knew, or were highly reckless in not knowing, of the safety problems facing Legacy VG's, and later the Company's, vehicles, they nonetheless

failed to disclose the existence or extent of the problems and instead caused and/or permitted the Company to issue false and misleading statements about the safety of the Eve and Unity spacecrafts.

35.    At the start of August 2020, the Company pushed back scheduled flights. This was the first sign to the market that there may have been something wrong with the Company's vehicles.  For instance, on August 3, 2020, the Company announced that Defendant Branson would not be flying in a Company spacecraft in 2020 despite having previously maintained that he would do so.

36.    On this news, the Company's stock price fell $3.30 or 13.7% to close August 4, 2020 at $20.72 per share.

37.    On December 12, 2020, Unity's rocket system failed to activate on a test flight. That the rockets failed to ignite was reported by the media, though the cause was not disclosed at that time.

38.    The next trading day, December 14, 2020, the Company's share price fell $5.57 or 17.4% to close at $26.47 per share.

39.    The Company was able to rehabilitate its image in the near-term when, on February 1, 2021, the Company announced via press release that the issue with the December 2020 test flight had been remediated and that the Company would be conducting a new test flight in February 2021.

40.    On this news, the Company's share price soared to close February 1, 2021 at $53.79.

41.    However, on February 1, 2021, *The Washington Post*, published a review of a forthcoming book authored by a writer for *The New York Times*, Nicholas Schmidle

("Schmidle"), entitled *Test Gods: Virgin Galactic and the Making of a Modern Astronaut*—disclosing that an issue with the February 2019 spaceflight had nearly killed everyone on board.

42.     On February 2, 2021, the Company's share price had fallen back down to $48.58 per share.

43.     On February 2, 2021, a rocket belonging to SpaceX, one of the Company's competitors, exploded on the launchpad.  The explosion created the public impression that the Company's rockets were further along in development than SpaceX's rockets.   In turn, this public impression led to a quick price rebound for the Company's common stock.

44.     On February 25, 2021, the Company announced that in remedying the problem with the December 2020 flight, the Company had created other problems with sensors in the Unity vehicle.

45.     On this news, the Company's common stock declined by $5.01 or 11.8% to close February 26, 2021 at $37.23 per share.

46.     The Company was able to conduct a test flight in May 2021 and in July 2021 it was able to take Defendant Branson into space to much fanfare.

47.     Both the Company and Defendant Branson capitalized on this good news. Between July 12 and July 16, 2021, the Company sold $500 million of its shares in the open market.  Between August 10 and August 12, 2021, Defendant Branson sold 10.4 million shares for $300.9 million in proceeds.

48.     However, during the July 2021 flight, the Unity aircraft strayed outside of its "landing cone" or the volume of space that the Unity is required by Federal Aviation Administration ("FAA") regulations to stay within in order to ensure that the craft makes it back to the intended landing zone and avoids crash landing in an unintended location.

49.    The FAA told *The Washington Post* that it began investigating these circumstances on July 23, 2021, despite the Company telling investors that the FAA investigation had begun on August 11, 2021.  Under either date, some or all of Defendant Branson's stock sales occurred *after* the FAA was investigating the Company but *before* the Company had announced the existence of either the underlying problem with Unity or the FAA investigation.

50.    What had occurred on the flight would not become public knowledge until September 1, 2021 when the *New Yorker* published an article disclosing that the July 2021 flight had left its cone.  On September 2, 2021, the FAA announced that it was grounding the Company's flights.

51.    On this news, the price per share of the Company's common stock closed at $25.99 per share.

52.    On October 14, 2021, the Company issued a press release reporting that—due to a supposedly newly-discovered "possible reduction in the strength margins of certain materials used to modify specific joints"—the Company would be delaying any further test flights until at least the fourth quarter of 2022.

53.    On this news, the price of the Company's common stock fell over 16.9%, or $4.05 per share, from $24.06 at close on October 14, 2021, to $20.01 at close on October 15, 2021.

54.    According to former Company employees taken from the Securities Class Action entitled *Lavin v. Virgin Galactic Holdings, Inc., et al.*, Case 1:21-cv-03070-ARR-TAM (E.D.N.Y.) (the "Securities Class Action"), the defects announced on October 14, 2021 were not newly discovered.  They had been known internally since at least 2018.

## FALSE AND MISLEADING STATEMENTS

9

55.    On July 9, 2019, Defendants announced the de-SPAC transaction. A press release attributed to the Company and SCH and quoting Branson, Whitesides, and Palihapitya stated:

> VG believes it has now reached an inflection point in its development as it progresses towards launching commercial operations. In particular, by demonstrating the repeatability of the full flight profile through the completion of two crewed spaceflights, VG believes it has overcome a substantial number of the technical hurdles required to make the company a viable and profitable commercial service.

56.    The statements were false and misleading because: (i) the second of the two spaceflights, the February 2019 flight, was not a success because it had ended in disaster; (ii) the flights were not repeatable, as on the second flight, Unity's horizontal stabilizers were destroyed and took up to fourteen months to replace; (iii) the Company had grounded Unity to address the horizontal stabilizers and many other known safety problems; (iv) Eve developed cracks after every flight, many of which were not being fixed; (v) Unity had encountered major safety problems in its first, third, fourth, and fifth powered flights to date, all of which would need to be addressed before any commercial flights; (vi) Unity and Eve were prototypes and would likely never be ready for commercial flights; (vii) the Company's inspections could not detect problems; (viii) the Company did not know Unity and Eve's configuration; (ix) because of (i)-(viii), and the Company was nowhere near any inflection point, in that Unity and Eve were nowhere near ready to take on passengers, if they ever would be.

57.    The release also quoted Defendant Branson:

> Great progress in our test flight program means that we are on track for our beautiful spaceship to begin commercial service.  By embarking on this new chapter, at this advanced point in Virgin Galactic's development, we can open space to more investors and in doing so, open space to thousands of new astronauts.

58.    The statements were false because: (i) Unity's latest spaceflight, the February 2019 flight, was not a success because it had nearly ended in disaster; (ii) unbeknownst to

investors, the Company had grounded Unity while the Company obtained new horizontal stabilizers and while it installed a digital control system to address uncontrollable shaking at Mach 1.8, among other potentially catastrophic problems; (iii) Eve developed cracks every flight, many of which were not being fixed; (iv) Unity had encountered major safety problems in its first, third, fourth, and fifth powered flights to date, all of which would need to be addressed before any commercial flights; (v) Unity and Eve were prototypes and would likely never be ready for commercial flights; (vi) the Company had not developed a proper inspection system that could detect problems; (vii) the Company did not know Unity and Eve's configuration; and (viii) because of (i)-(vii), the Company's testing program was neither on track nor advanced.

59.    The release also quoted Defendant Palihapitya:

"It is a privilege to partner with Sir Richard Branson, a once-in-a-generation visionary, to bring the reality of commercial spaceflight to the world.  We are confident that VG is light years ahead of the competition. It is backed by an exciting business model and an uncompromising commitment to safety and customer satisfaction. I cannot wait to take my first trip to space and become an astronaut."

60.    The statements were false because: (i) Unity's latest spaceflight, the February 2019 flight, was not a success because it had nearly ended in disaster; (ii) unbeknownst to investors, the Company had grounded Unity while the Company obtained new horizontal stabilizers and while it installed a digital control system to address uncontrollable shaking at Mach 1.8, among other potentially catastrophic problems; (iii) Eve developed cracks every flight, many of which were not being fixed; (iv) Unity had encountered major safety problems in its first, third, fourth, and fifth powered flights to date, all of which would need to be addressed before any commercial flights; (v) Unity and Eve were prototypes and would likely never be ready for commercial flights; (vi) the Company had not developed a proper inspection system that could detect problems; (vii) the Company did not know Unity and Eve's configuration; and

(viii) because of (i)-(vii), the Company's testing program was neither on track nor advanced.

61.    On July 9, 2019, Defendants publicly filed two letters, one of which was signed by Defendant Whitesides, and both stated under header "Why and Why Now?" that:

> With the clearing of the huge technical milestone which came from demonstrating Unity's full flight profile with two trips to space, and the subsequent decision that we were ready to move the teams to Spaceport America, we were presented with a few options, and have decided this is the best course for the business.

62.    The statements were false because: (i) the second of the two spaceflights, the February 2019 flight, was not a success because it had nearly ended in disaster; (ii) the flights were not repeatable, as on the second flight, Unity's horizontal stabilizers were destroyed and took up to fourteen months to replace; (iii) the Company had grounded Unity to address the horizontal stabilizers and many other known safety problems; (iv) Eve developed cracks every flight, many of which were not being fixed; (v) Unity had encountered major safety problems in its first, third, fourth, and fifth powered flights to date, all of which would need to be addressed before any commercial flights; (vi) Unity and Eve were prototypes and would likely never be ready for commercial flights; (vii) the Company's inspection could not detect problems; (viii) the Company did not know Unity and Eve's configuration; and (ix) because of (i)-(viii), the second spaceflight was not a milestone and the company is nowhere near the end of its testing program.

63.    On July 9, 2019, Defendant Branson publicly filed a letter with the SEC:

> Opening Virgin Galactic to further external investment has been on the cards for a while. Great progress in our test flight program means that the remaining hurdles, before our beautiful spaceship starts a full commercial service, are steadily being cleared. Having sadly had to pull away from an investment by Saudi Arabia after the murder of journalist Jamal Khashoggi, and then having demonstrated the repeatability of our full flight profile with two crewed spaceflights, we had an opportunity to rethink our investment plans.

64.    The statements were false because: (i) the second of the two spaceflights, the February 2019 flight, was not a success because it had nearly ended in disaster; (ii) the flights

were not repeatable, as on the second flight, Unity's horizontal stabilizers were destroyed and took up to fourteen months to replace; (iii) the Company had grounded Unity to address the horizontal stabilizers and many other known safety problems; (iv) Eve developed cracks every flight, many of which were not being fixed; (v) Unity had encountered major safety problems in its first, third, fourth, and fifth powered flights to date, all of which would need to be addressed before any commercial flights; (vi) Unity and Eve were prototypes and would likely never be ready for commercial flights; (vii) the Company's inspection could not detect problems; (viii) the Company did not know Unity and Eve's configuration; and (ix) because of (i)-(viii), the second spaceflight was not a milestone and the company is nowhere near the end of its testing program.

65.    On August 8, 2019, Defendants filed a draft Registration Statement on Form S-4. The August Registration Statement provided:

> Unsatisfactory safety performance of our spaceflight systems could have a material adverse effect on our business, financial condition and results of operation. We manufacture and operate highly sophisticated spaceflight systems and offer a specialized astronaut experience that depends on complex technology. While we have built operational processes to ensure that the design, manufacture, performance and servicing of our spaceflight systems meet rigorous quality standards, there can be no assurance that we will not experience operational or process failures and other problems, including through manufacturing or design defects, pilot error, cyber-attacks or other intentional acts, that could result in potential safety risks. Any actual or perceived safety issues may result in significant reputational harm to our businesses, in addition to tort liability, maintenance, increased safety infrastructure and other costs that may arise. Such issues with our spaceflight systems or customer safety could result in delaying or cancelling planned flights, increased regulation or other systemic consequences. Our inability to meet our safety standards or adverse publicity affecting our reputation as a result of accidents, mechanical failures, damages to customer property or medical complications could have a material adverse effect on our business, financial condition and results of operation.

66.    The statements were false because they omitted to disclose: (i) potentially catastrophic problems had already occurred on four of Unity's five powered flights; (ii) myriad other safety problems existed and were not addressed; (iii) Unity was not even airworthy under

FAA standards; (iv) Unity's inspectors were not qualified, certified, or dedicated; (v) Unity did

not keep track of the design of its vehicles or modifications to them; (vi) in at least one instance,

in Defendant Moses's presence, a Company executive told an employee not to put a potential

safety hazard "on paper" so that there would be no repercussions if there was a fatal accident;

(vii) the Company's inspections could not detect problems; (viii) the Company did not know

Unity and Eve's configuration; therefore, and (ix) as a result of (i)-(viii), the Company did not

meet even basic safety standards, let alone rigorous ones, and its processes were not designed to

surface and address safety issues.

67.     The August Registration Statement also provided:

Human spaceflight is an inherently risky activity that can lead to accidents or
catastrophes impacting human life.  For example, on October 31, 2014, VSS
Enterprise, an earlier model of SpaceShipTwo manufactured and operated by a
third-party contractor, had an accident during a rocket-powered test flight. The
pilot was seriously injured, the co-pilot was fatally injured and the vehicle was
destroyed. While we have taken steps to address the causes of this accident and
taken other preventative safety measures, there is a possibility that other accidents
may occur in the future for a variety of reasons, some of which may be out of our
control. Any such accident could result in substantial losses to us, including
reputational harm and legal liability, and, as a result, could have a material
adverse effect on our business, financial condition and results of operations.

68.     The statements were false because they omitted to disclose that: (i) potentially

catastrophic problems had already occurred on four of Unity's five powered flights; (ii) myriad

other safety problems existed and were not addressed; (iii) Unity was not even airworthy under

FAA standards; (iv) Unity's inspectors were not qualified, certified, or dedicated; (v) Unity did

not keep track of the design of its vehicles or modifications to them; (vi) in at least one instance,

in Defendant Moses's presence, a Company executive told an employee not to put a potential

safety hazard "on paper" so that there would be no repercussions if there was a fatal accident;

(vii) the Company did not know Unity and Eve's configuration; and, therefore, and (viii) as a

result of (i)-(vii), the Company did not meet even basic safety standards, let alone rigorous ones, and its processes were not designed to surface and address safety issues.

69.    Defendants repeated the statements in the documents referenced in the subparagraphs below. They are false for the same reasons:

(a)    Amendments to the August Registration Statement filed on September 13 and 25 and October 3 and 8, 2019, all signed by Defendant Palihapitiya;

(b)    A Registration Statement on Form S-1/A filed on February 14, 2021, and subsequently amended on February 28, 2020, which was signed by Defendants Whitesides and Palihapitiya;

(c)    The Company's 10-K for the year ended December 31, 2019, filed February 28, 2020, signed by Defendants Whitesides and Palihapitiya;

(d)    A Registration Statement on Form S-1 filed on May 1, 2020, and subsequently amended on May 11, 2020, signed by Defendants Whitesides and Palihapitiya;

(e)     A Registration Statement on Form S-1 filed on August 3, 2020, signed by Defendants Colglazier and Palihapitiya;

(f)    The Company's 10-K for the year ended December 31, 2020, filed on Mach 1, 2021, and amended on March 11, 2021, signed by Defendants Colglazier and Palihapitiya;

(g)    A Registration Statement on Form S-3, filed May 28, 2021, and subsequently amended on June 17, 2021, signed by Defendants Colglazier and Palihapitiya.

70.    On September 5, 2019, the Company filed a Prospectus on Form 425. The

Prospectus provided:



71.    The statements were false because they omitted to disclose that: (i) potentially catastrophic problems had already occurred on four of Unity's five powered flights; (ii) myriad other safety problems existed and were not addressed; (iii) Unity was not even airworthy under FAA standards; (iv) Unity's inspectors were not qualified, certified, or dedicated; (v) Unity did not keep track of the design of its vehicles or modifications to them; (vi) in at least one instance, in Defendant Moses's presence, a Company executive told an employee not to put a potential safety hazard "on paper" so that there would be no repercussions if there was a fatal accident; (vii) Unity and Eve were prototypes that were not designed to withstand many flights; (viii) the Company did not know Unity and Eve's configuration; (ix) Unity and Eve needed extended maintenance after every flight; (x) as a result of (i)-(ix), the Company did not meet even basic safety standards, let alone rigorous ones, and its processes were not designed to surface and

address safety issues; and (xi) Unity and Eve were not safe, maintainable, or reliable.

72.     On October 16, 2019, Defendant Branson was interviewed by *Bloomberg Markets*:

> **Question**: Well, the spaceship looks amazing and I'm sure it's comfortable as well. I want to go on a little bit to find out how the test flights are going so far, because I believe you're currently carrying out these test flights. Give us a sense of the frequency of the test flights and how far they travel and what you've learned so far from them.

> **Defendant Branson**: So, we've had an incredible few months. We're the only space company in America, including NASA, to put people into space since 2009. We put five – we made five new astronauts. And, so, now what they're doing is fitting out the interior of the spaceship for passenger use, moving the mothership and the spaceship to our lovely space port in New Mexico. We'll then do a few more test flights. Then next year I'll go up, and then we'll start putting people up. And, so, we've got an exciting few months ahead.

73.     The statements were misleading because, among other things: (i) Unity's latest spaceflight, the February 2019 flight, had nearly ended in disaster; (ii) the flights were not repeatable, because on the second flight, Unity's horizontal stabilizers were destroyed and took up to fourteen months to replace; (iii) Unity was not flying because it was grounded for safety problems, not because it was moving to New Mexico; (iv) the Company had encountered major unresolved safety problems in its first, third, fourth, and fifth powered flights to date, all of which would need to be addressed before any commercial flights; (v) Eve developed cracks every flight, many of which were not being fixed; (vi) Unity was grounded with no end in sight; (vii) the Company did not know Unity and Eve's configuration; (viii) because of (i)-(vii) so there was no basis to claim that Branson would fly in 2020; (ix) because of (i)-(vii) and because Unity was a prototype not suitable for commercial flight, there was no reason to believe it would ever "start putting people up"; and, therefore (x) Defendants' statements were misleading.

74.     On October 28, 2019, Defendants Branson and Whitesides were interviewed by a

*Bloomberg* reporter:

**Question**: Talk to me about becoming a public company, because it seems an industry that perhaps should be private. There's going to be a lot of scrutiny, I guess, about what you guys are doing, and it just seems like it's always going to be one accident, one crash away from oblivion. So, what was the logic to becoming a public company?

**Defendant Branson**: Well, we spent fifteen years developing the company as a private company, and there came a stage where we felt "Let's involve the public. Let's involve institutions" to help us on to the final stage. What's been gratifying is that many of the biggest institutions in the world have been to the space port, have been to the Mojave, they've seen the spaceships, the way that rockets are built, and they feel comfortable, I think, with the job our team has done over the last fifteen years. I think the other thing, which I think George can talk to, is just how safe our spaceship company is, in the way it's been built. Do you want to touch on that, George?

**Whitesides**: Sure. I mean, what's exciting, is that we've been flight testing these vehicles, for now, nearly ten years, and we believe we have an architecture that is extremely reliable and also has aspects that are very suited to the customer experience. For example, taking off from a runway, landing on a runway. Those are things that I think will have a very nice, smooth start and ending to the customer experience. And, then, our rocket motor is actually the simplest and, thus, safest – we think – human-rated rocket motor for our class of rocketry. So, for all these reasons we feel really good about the system.

75.    The statements were misleading because: (i) the second of the two spaceflights, the February 2019 flight, was not a success because it had nearly ended in disaster; (ii) on that flight, Unity's horizontal stabilizers were destroyed and took up to fourteen months to replace; (iii) the Company had grounded Unity to address the horizontal stabilizers and many other known safety problems; (iv) Eve developed cracks every flight, many of which were not being fixed; (v) the Company had encountered unresolved major safety problems in its first, third, fourth, and fifth powered flights to date, all of which would need to be addressed before any commercial flights; (vi) the Company's inspections could not detect problems; (vii) Unity and Eve were prototypes designed to withstand just a few flights; (viii) the Company did not know Unity and Eve's configuration; (ix) because of (i)-(viii) because the Company regularly did not

address safety issues as they arose, the Company's vehicles were neither reliable nor safe; and, therefore (x) Defendants' statements were misleading.

76.     In that same interview, Defendant Branson stated:

[S]uccess is creating the world's first space company, and it is the first space company to float on the stock exchange, and it's the first commercial space company to spend five people into space. So, we've had an extraordinary few months and next year I'll be going into space, and we'll be starting to send a lot of people into space.

77.     The statements were misleading because: (i) the second of the two spaceflights on which the Company made astronauts, had nearly ended in disaster; (ii) the flights were not repeatable, because on the second flight, Unity's horizontal stabilizers were destroyed and took up to fourteen months to replace; (iii) Unity was not flying because it was grounded for safety problems; (iv) the Company had encountered major unresolved safety problems in its first, third, fourth, and fifth powered flights to date, all of which would need to be addressed before any commercial flights; (v) Eve developed cracks every flight, many of which were not being fixed; (vi) Unity was grounded with no end in sight; (vii) the Company's inspections could not detect problems; (viii) the Company did not know Unity and Eve's configuration; (ix) because of (i)-(viii) there was no basis to claim that Branson would fly in 2020; (x) because of (i)-(viii) and because Unity was a prototype not suitable for commercial flight, there was no reason to believe it would ever "start[] to send a lot of people into space"; and (xi) Defendants' statements were misleading without disclosure of (i)-(viii).

78.     During that interview, Defendant Branson also stated that: "well, I think, we have the advantage of having already put people into space and we've made five new astronauts; there haven't any others made on American soil since 2009.  And, so, we have a tested and tried system that is performing well."

79.    The statements were misleading because, among other things: (i) the second of the two spaceflights, the February 2019 flight, was not a success because it had nearly ended in disaster; (ii) Unity's architecture was not reliable, as on the second flight, Unity's horizontal stabilizers were destroyed and took up to fourteen months to replace; (iii) the Company had grounded Unity to address the horizontal stabilizers and many other known safety problems; (iv) Eve developed cracks every flight, many of which were not being fixed; (v) the Company had encountered major unresolved safety problems in its first, third, fourth, and fifth powered flights to date, all of which would need to be addressed before any commercial flights; (vi) the Company's inspections could not detect problems; (vii) the Company did not know Unity and Eve's configuration; and (viii) Defendants' statements that the Company's system was "tested and tried [and] performing well" were misleading without disclosure of (i)-(viii) because they materially conflicted with the impression reasonable investors would take from Defendants' statements.

80.    On November 20, 2019, Defendant Palihapitiya told *CNBC* that commercial flights "will begin in about six to nine months" and that "I think the story of Virgin is just so new that it hasn't been written yet.  We'll start commercial operations in the middle of next year, so the full-fledged business value will become apparent very quickly to a lot more people at that point."

81.    The statements were misleading because: (i) the second of the two spaceflights, the February 2019 flight, was not a success because it had nearly ended in disaster; (ii) the flights were not repeatable, because on the second flight, Unity's horizontal stabilizers were destroyed and took up to fourteen months to replace; (iii) Unity was grounded with no end in sight; (iv) the Company had encountered major unresolved safety problems in its first, third, fourth, and fifth

powered flights to date, all of which would need to be addressed before any commercial flights; (v) Eve developed cracks every flight, many of which were not being fixed; (vi) the Company's inspections could not detect problems; (vii) Unity and Eve were prototypes not meant to withstand more than a few flights; (viii) the Company did not know Unity and Eve's configuration; (ix) because of (i)-(viii) there was no basis to claim that commercial flights would begin in the following six to nine months; and, therefore, (x) Defendants' statements were misleading without disclosure of (i)-(viii) because they materially conflicted with the impression reasonable investors would take from Defendants' statements.

82.     On December 13, 2019, Defendants published a press release entitled *Reflecting on a Remarkable Year* on the Company's website:

> Virgin Galactic reaches space for the second time
>
> Ten weeks after our first flight to space, we did it again, travelling higher and faster than ever before and, for the first time, with a third crew member on board. ***This flight*** saw two more of our pilots, Dave Mackay and Mike 'Sooch' Masucci, become commercial astronauts, with Chief Pilot Mackay entering the record books as the first Scot in space. Our Chief Astronaut Instructor, Beth Moses, flew as the third crew member to carry out a live evaluation of cabin dynamics – floating freely in zero gravity. She became the first woman to fly on board a commercial spaceship and had the coveted honor of being awarded the title of Commercial Astronaut 007.

83.     The statements were misleading because: (i) the flight being referred to, the February 2019 flight, was not a success because it had nearly ended in disaster; (ii) the flight was not repeatable because on the flight, Unity's horizontal stabilizers were destroyed and took up to fourteen months to replace; (iii) Unity was not flying because it was grounded for safety problems; (iv) the Company had encountered major unresolved safety problems in its first, third, fourth, and fifth powered flights to date, all of which would need to be addressed before any commercial flights; (v) Eve developed cracks every flight, many of which were not being fixed;

and, (vi) Unity was grounded with no end in sight because the Company needed to repair it; (vii) the Company's inspections could not detect problems; (viii) the Company did not know Unity and Eve's configuration; (ix) because (i)-(viii) the impression Defendants gave by stating "we did it again", namely, that the flight was successful, was misleading; and, therefore, (x) Defendants' statements were misleading without disclosure of (i)-(viii), because they materially conflicted with the impression reasonable investors would take from Defendants' statements.

84.    The words "[T]his flight" in the above-quoted paragraph were a link to a February 22, 2019 press release Defendants published and placed on the Company's website entitled *Virgin Galactic Makes Space for Second Time in Ten Weeks with Three on Board, Reaching Higher Altitudes and Faster Speeds, as Flight Test Program Continues*, which provided:

> In its fifth supersonic rocket powered test flight, Virgin Galactic reached space for the second time today in the skies above Mojave CA. Spaceship VSS Unity reached its highest speed and altitude to date and, for the first time, carried a third crew member on board along with research payloads from the NASA Flight Opportunities program.
>
> This space flight means Chief Pilot Dave Mackay and co-pilot Michael "Sooch" Masucci become commercial astronauts and the 569th and 570th humans in space. Beth Moses, Virgin Galactic's Chief Astronaut Instructor, flew as the third crew member in a first, live evaluation of cabin dynamics. She is the 571st person to fly to space and the first woman to fly on board a commercial spaceship.
>
> In addition to this element of envelope expansion, VSS Unity flew higher and faster than ever before, as its world record-holding hybrid rocket motor propelled the spaceship at Mach 3.04 to an apogee of 295,007ft.
>
> The crew enjoyed extraordinary views of Earth from the black skies of space and, during several minutes of weightlessness while the pilots "feathered" the spaceship in preparation for a Mach 2.7 re-entry, Beth floated free to complete a number of cabin evaluation test points. The human validation of data previously collected via sensors, and the live testing of other physical elements of the cabin interior, are fundamental to the provision of a safe but enjoyable customer experience.
>
> The glide back home was followed by a smooth runway landing and a rapturous reception from the crowd on the flight line, which included staff and some of

Virgin Galactic's 600 Future Astronaut customers. Chief Pilot Dave Mackay, a born and bred Scotsman as well as an ex-RAF test pilot and Virgin Atlantic Captain, led his crew of newly qualified astronauts from VSS Unity accompanied by a kilted piper.

Today's flight notched several additional firsts for the industry: The flight was the first time that a non-pilot flew on board a commercial spaceship to space, and it was the first time that a crew member floated freely without restraints in weightlessness in space onboard a commercial spaceship; it was the first time that three people flew to space on a commercial spaceship, and Dave Mackay became the first Scottish-born astronaut (Brian Binnie, who was raised in Scotland, flew to space in 2004). Addressing colleagues and guests Dave said: "Beth, Sooch and I just enjoyed a pretty amazing flight which was beyond anything any of us has ever experienced. It was thrilling yet smooth and nicely controlled throughout with a view at the top, of the Earth from space, which exceeded all our expectations. I am incredibly proud of my crew and of the amazing teams at Virgin Galactic and The Spaceship Company for providing a vehicle and an operation which means we can fly confidently and safely. For the three of us today this was the fulfillment of lifelong ambitions, but paradoxically is also just the beginning of an adventure which we can't wait to share with thousands of others."

Sir Richard Branson said: "Flying the same vehicle safely to space and back twice in a little over two months, while at the same time expanding the flight envelope, is testament to the unique capability we have built up within the Virgin Galactic and The Spaceship Company organizations. I am immensely proud of everyone involved. Having Beth fly in the cabin today, starting to ensure that our customer journey is as flawless as the spaceship itself, brings a huge sense of anticipation and excitement to all of us here who are looking forward to experiencing space for ourselves. The next few months promise to be the most thrilling yet"

85.    The statements were misleading because: (i) the flight being referred to, the February 2019 flight, had nearly ended in disaster; (ii) the flight was not repeatable, because on the flight, Unity's horizontal stabilizers were destroyed and took up to fourteen months to replace; (iii) Unity was not flying because it was grounded for safety problems; (iv) the Company had encountered major unresolved safety problems in its first, third, fourth, and fifth powered flights to date, all of which would need to be addressed before any commercial flights; (v) Eve developed cracks every flight, many of which were not being fixed; (vi) Unity was grounded with no end in sight; (vii) the Company's inspections could not detect problems; (viii)

Unity and Eve were prototypes built to withstand only a few flights; (ix) the Company did not know Unity and Eve's configuration; and therefore (x) because of (i)-(ix) there was no basis to claim that the Company could offer "safe [and] enjoyable customer experience[s]"; (xi) because of (i)-(ix) Defendants had no basis to say "we can fly confidently and safely"; (xii) the impression Defendant Branson gave with his statement that the Company had flown "the same vehicle safely to space and back twice in a little over two months", namely that the flights were safe and themselves repeatable, was misleading; and, therefore (xiii) Defendants' statements were misleading without disclosure of (i)-(xii) because they materially conflicted with the impression reasonable investors would take from Defendants' statements.

86.    On February 25, 2019, the Company published a press release ("Q4 2019 Press Release") and held a call ("Q4 2019 Call") to discuss its Q4 2019 earnings.

87.    The Q4 2019 Press Release quoted Defendant Whitesides:

*"Throughout 2019, we continued to achieve key milestones in our mission to open access to space in a safe, innovative and affordable way,"* said George Whitesides, Chief Executive Officer of Virgin Galactic. "During the fourth quarter, we took major steps toward reaching that goal by completing our transaction with Social Capital Hedosophia and becoming publicly listed on the NYSE, as well as building operational readiness at Spaceport America in New Mexico. *The progress we made in 2019,* combined with the high level of interest from potential customers*, underpin the steps we are taking toward reopening ticket sales. We are continuing to build on our strong momentum as we enter the most exciting chapter of our story to date and prepare for commercial launch."*

88.    The statements were misleading because: (i) there was no progress in 2019, in that the only spaceflight in February 2019 was not a success because it nearly ended in disaster; (ii) the flights were not repeatable, because on the second flight, Unity's horizontal stabilizers were destroyed and took up to fourteen months to replace; (iii) Unity was not flying because it was grounded for safety problems; (iv) the Company had encountered major unresolved safety

problems in its first, third, fourth, and fifth powered flights to date, all of which would need to be addressed before any commercial flights; (v) Eve developed cracks every flight, many of which were not being fixed; (vi) Unity was grounded with no end in sight; (vii) the Company's inspections could not detect problems; and, therefore, (viii) Unity and Eve were prototypes not suitable for commercial flight; (ix) the Company did not know Unity and Eve's configuration; and (x) Defendants' statements were misleading without disclosure of (i)-(ix), because they materially conflicted with the impression reasonable investors would take from Defendants' statements.

89.    On the Q4 2019 Call, Defendant Whitesides stated:

We followed [the December 2018 flight] up by having the first non-pilot crew member flown on a commercial space vehicle on February 22, 2019. Beth Moses, our chief Astronaut Instructor, ***completed her first successful space flight,*** becoming the first nonpilot crew member to fly on a commercial space vehicle[.]

90.    The statements were misleading because, among other things: (i) the February 2019 flight Whitesides refers was not successful because it had nearly ended in disaster; (ii) on that flight, Unity's horizontal stabilizers were destroyed and took up to fourteen months to replace; (iii) Unity was not flying because it was grounded for safety problems; (iv) the Company had encountered major unresolved safety problems in its first, third, fourth, and fifth powered flights to date, all of which would need to be addressed before any commercial flights; (v) Eve developed cracks every flight, many of which were not being fixed; (vi) Unity was grounded with no end in sight; (vii) the Company's inspections could not detect problems; (viii) the Company did not know Unity and Eve's configuration; (ix) because of (i)-(viii) so there was no basis to call the February 22, 2019 flight successful; and, therefore, (x) Defendants' statements were misleading without disclosure of (i)-(ix) because they materially conflicted with the impression reasonable investors would take from Defendants' statements.

25

91.     In the Q&A portion of the Q4 2019 Call, Defendant Whitesides stated:

**<u>Question</u>**: What are the key gating items from among those three [flight test, customer experience, and readying the vehicles] that you need to get through to get this first commercial flight? And are you still on schedule for mid-summer? It sounded before like – the schedules influx a little bit as you get everything as perfect as you need.

**<u>Defendant Whitesides</u>**: Yeah. Well, as you know, ***our number one priority is to fly safely, and not just Sir Richard but anybody we fly whether it's the pilots that we fly or employees that we might fly in the late test program, that's our number one priority.*** What we're affirming today as you know that our number one priority is to fly Richard Branson into space on a commercial flight in 2020. That's what our entire organization is really that they know that that's the top priority.

92.     The statements were misleading because: (i) the February 2019 flight Whitesides refers was not successful because it had nearly ended in disaster; (ii) on that flight, Unity's horizontal stabilizers were destroyed and took up to fourteen months to replace; (iii) Unity was not flying because it was grounded for safety problems; (iv) the Company had encountered major unresolved safety problems in its first, third, fourth, and fifth powered flights to date, all of which would need to be addressed before any commercial flights; (v) Eve developed cracks every flight, many of which were not being fixed; (vi) Unity was grounded with no end in sight; (vii) the Company's inspections could not detect problems; (viii) the Company did not know Unity and Eve's configuration; (ix) because of (i)-(viii) there was no basis to claim that flying Branson into space in 2020 was at all a realistic goal; (x) in at least one instance, in Moses's presence, a Company executive told an employee not to put a potential safety hazard "on paper" so that there would be no repercussions if there was a fatal accident; (xi) Defendants' statements were misleading without disclosure of (i)-(x) because they materially conflicted with the impression reasonable investors would take from Defendants' statements.

93.     On May 5, 2020, the Company held a call ("Q1 2020 Call") to discuss its Q1 2020

earnings.  On the Q1 2020 Call, Defendant Whitesides stated:

> Turning to Slide 7. Let me start briefly highlighting some of the key milestones we achieved in 2019 that demonstrate our progress and pace so far. Following our successful launch of the first commercial space vehicle to put humans in space in December 2018, *we flew the first non-pilot crew member, our Chief Astronaut Instructor Beth Moses, on a commercial space vehicle in February 2019*

94.    The statements were misleading because: (i) Unity's spaceflight in 2019 was not successful because it had nearly ended in disaster; (ii) on that flight, Unity's horizontal stabilizers were destroyed and took up to fourteen months to replace; (iii) Unity was not flying because it was grounded for safety problems; (iv) the Company had encountered major unresolved safety problems in its first, third, fourth, and fifth powered flights to date, all of which would need to be addressed before any commercial flights; (v) Eve developed cracks every flight, many of which were not being fixed; (vi) Unity was grounded with no end in sight; (vii) the Company's inspections could not detect problems; (viii) because of (i)-(viii) so there was no basis to suggest the February 22, 2019 flight was successful; and, therefore, (ix) Defendants' statements were misleading without disclosure of (i)-(vii) because they materially conflicted with the impression reasonable investors would take from Defendants' statements.

95.    On June 25, 2020, the Company published a press release reporting its second glide flight from Spaceport America.  The press release quoted Defendant Whitesides:

> "*I am thrilled with the team's hard work to complete today's test flight successfully.  It was an important test that, pending data review, means we can now start preparing the vehicles for powered flight. Our focus for this year remains unchanged on ensuring the vehicles and our operations are prepared for long-term, regular commercial spaceflight service.*"

96.    The statements were misleading because: (i) Unity was not ready for powered flights because Virgin Galactic employees were still installing parts necessary for it to function; the February 2019 flight Whitesides refers was not successful because it had nearly ended in

disaster; (ii)  the Company had a track record of unsuccessful flights, because it had encountered

major unresolved safety problems in its first, third, fourth, and fifth powered flights to date, all of

which would need to be addressed before any commercial flights; (iii) on the February 2019

flight, Unity's horizontal stabilizers were destroyed and took up to fourteen months to replace;

(iv) Eve developed cracks every flight, many of which were not being fixed; (v) the Company's

inspections could not detect problems; (vi) Unity and Eve were prototypes not suitable for

commercial flight; (vii) whatever small milestones the Company met were not related to

commercialization; (viii) the Company did not know Unity and Eve's configuration; and,

therefore, (ix) Defendants' statements were misleading without disclosure of (i)-(viii) because

they materially conflicted with the impression reasonable investors would take from Defendants'

statements.

97.    On July 15, 2020, the Company held a call to discuss Defendant Colglazier's

appointment as CEO.  On the call, Defendant Whitesides informed the market that the Company

was "within spitting distance" of commercial operations:

> **Question**: Okay great. And then just – I think I know the answer to this one.  But
> to me, it seems like a pretty big signal you guys are putting out here today that
> you feel that the technical risk of the flight test program is largely retired? Is that a
> correct takeaway for me?
>
> **Defendant Whitesides:** *I think it's fair to say that we are now within spitting*
> *distance, and we are in a multi-month march to commercial ops.  So things are*
> *going well.*

98.    The statements were misleading because: (i) Unity was not ready for powered

flights because Virgin Galactic employees were still installing parts necessary for it to function;

(ii) the Company had a track record of unsuccessful flights, because it had encountered major

unresolved safety problems in its first, third, fourth, and fifth powered flights to date, all of

which would need to be addressed before any commercial flights; (iii) on the February 2019

flight, Unity's horizontal stabilizers were destroyed and took up to fourteen months to replace; (iv) Eve developed cracks every flight, many of which were not being fixed; (v) the Company's inspections could not detect problems; (vi) Unity and Eve were prototypes not suitable for commercial flight; (vii) the Company did not know Unity and Eve's configuration; (viii) whatever milestones the Company were not related to commercialization; and, therefore, (ix) Defendants' statements were misleading without disclosure of (i)-(viii) because they materially conflicted with the impression reasonable investors would take from Defendants' statements.

99.    On July 28, 2020, the Company published a video unveiling Unity's cabin. During the presentation, Defendant Colglazier stated:

> Today, we're sharing the combination of incredible creativity, unswerving dedication, and total commitment to realizing our dream of opening space, to change the world for good. In a moment, we will be revealing to you for the first time, the interior design of our spaceship cabin. In many ways, the cabin is the design centerpiece of this transformational journey. ***It's this cabin that will enable hundreds and then thousands of people to embark on one of the most unforgettable journeys of their lives, that a space flight.*** Our astronauts are going to experience the majesty of space from within these cabins walls and they'll be peering out the windows at the beauty of our home planet from the black sky around them.

100.    The statements were misleading because: (i) Unity was not ready for powered flights because the Company employees were still installing parts necessary for it to function; (ii) the Company had a track record of unsuccessful flights, because it had encountered major unresolved safety problems in its first, third, fourth, and fifth powered flights to date, all of which would need to be addressed before any commercial flights; (iii) on the February 2019 flight, Unity's horizontal stabilizers were destroyed and took up to fourteen months to replace; (iv) Eve developed cracks every flight, many of which were not being fixed; (v) the Company's inspections could not detect problems; (vi) Unity and Eve were prototypes not suitable for commercial flight; (vii) the Company did not know Unity and Eve's configuration; (viii) Unity's

cabin would not take "hundreds and then thousands of people" to space, because Unity was a prototype well past its expiration date; (ix) Defendants' statements were misleading without disclosure of (i)-(viii) because they materially conflicted with the impression reasonable investors would take from Defendants' statements.

101.    For his part, Defendant Whitesides stated:

Our cabin needs to balance the functional and emotional needs of our customers in a high adrenaline environment, as well as a weightless viewing platform. So every touchpoint has been designed with intuitive usability. ***Virgin Galactic Spaceship 2 system is designed to fly both humans and science research payloads to space.*** So the cabin design is flexible.

102.    The statements were misleading because: (i) Unity was not ready for powered flights because the Company employees were still installing parts necessary for it to function; (ii) Virgin Galactic had a track record of unsuccessful flights, because it had encountered major unresolved safety problems in its first, third, fourth, and fifth powered flights to date, all of which would need to be addressed before any commercial flights; (iii) on the February 2019 flight, Unity's horizontal stabilizers were destroyed and took up to fourteen months to replace; (iv) Eve developed cracks every flight, many of which were not being fixed; (v) the Company's inspections could not detect problems; (vi) Unity and Eve were prototypes not suitable for commercial flight; (vii) Unity and Eve were designed to fly a few test flights and then serve as resources for the Company to design its own shuttles; therefore, (viii) Unity was not designed to fly either humans or payloads to space; (ix) the Company did not know Unity and Eve's configuration; and (x) Defendants' statements were misleading without disclosure of (i)-(ix) because they materially conflicted with the impression reasonable investors would take from Defendants' statements.

103.    On August 3, 2020, the Company held an earnings call ("Q2 2020 Call") to

discuss Q2 2020 highlights.

104.    On the Q2 2020 Call, Defendant Colglazier stated:

*As always, safety will remain our central focus* and we will continue to progress with a step-by-step diligent approach throughout the test flight program as we prepare for commercial service.  As such, our schedule may adjust as we process data from each of our test flights.

105.    The statements were misleading because: (i) the February 2019 flight had nearly ended in disaster; (ii) on that flight, Unity's horizontal stabilizers were destroyed and took up to fourteen months to replace; (iii) the Company had encountered major unresolved safety problems in its first, third, fourth, and fifth powered flights to date, all of which would need to be addressed before any commercial flights; (iv) Eve developed cracks every flight, many of which were not being fixed; (v) the Company's inspections could not detect problems; (vi) in at least one instance, in Defendant Moses's presence, a Company executive told an employee not to put a potential safety hazard "on paper" so that there would be no repercussions if there was a fatal accident; (vii) the Company did not know Unity and Eve's configuration; therefore (viii) schedules were the Company's priority, not safety; and (ix) Defendants' statements were misleading without disclosure of (i)-(viii) because they materially conflicted with the impression reasonable investors would take from Defendants' statements.

106.    On October 14, 2020, the Company published a press release reporting that it was preparing for another powered flight:

*In these final preparations we are working through a number of rigorous steps to prepare the vehicles, pilots, teams and facilities, ensuring that we remain focused on safety as our top priority.*

*                *                *

Preparing VSS Unity for flight also includes a "practice run" for the spaceship, as well as the pilots and teams in mission control.  We put Unity through its paces on the ground, testing all systems prior to flight to ensure functionality – including

raising the feather, swinging the landing gear, firing the reaction control thrusters, and sweeping the flight control systems through full range of motion. Pre-flight vehicle checks are designed to functionally verify that all systems are working as they should be, prior to the take-off.

107. The statements were misleading because: (i) the February 2019 flight had nearly ended in disaster; (ii) on that flight, Unity's horizontal stabilizers were destroyed and took up to fourteen months to replace; (iii) the Company had encountered major unresolved safety problems in its first, third, fourth, and fifth powered flights to date, all of which would need to be addressed before any commercial flights; (iv) Eve developed cracks every flight, many of which were not being fixed; (v) the Company's inspections could not detect problems; (vi) in at least one instance, in Defendant Moses's presence, a Company executive told an employee not to put a potential safety hazard "on paper" so that there would be no repercussions if there was a fatal accident; (vii) the Company did not know Unity and Eve's configuration; therefore (viii) schedules were the Company's priority, not safety; and (ix) Defendants' statements were misleading without disclosure of (i)-(viii) because they materially conflicted with the impression reasonable investors would take from Defendants' statements.

108. On November 2, 2020, the Company published a press release attributed to Defendant Moses:

> *The spaceflight system is designed for rapid commercial turnaround, so it is much better to stay on the side of caution and return to base to understand the data and prepare for another test flight.*

> \*    \*    \*

> *We've made upgrades to the horizontal stabilizers (known as H-Stabs), which are the flight control surfaces on the outboard of the feather booms.* We've also made improvements to the flight control system that commands these Hstabs to move in response to pilot inputs. We've already flown these improvements on our last two glide flights, and they performed well. Together these mods will enhance the performance of the spaceship and support long-term commercial service.

109.    The statements were misleading because: (i) Unity was not ready for powered flights because Company employees were still installing parts necessary for it to function; (ii) the Company had a track record of unsuccessful flights, because it had encountered major unresolved safety problems in its first, third, fourth, and fifth powered flights to date, all of which would need to be addressed before any commercial flights; (iii) on the February 2019 flight, Unity's horizontal stabilizers were destroyed and took up to fourteen months to replace; (iv) Eve developed cracks every flight, many of which were not being fixed; (v) the Company's inspections could not detect problems; (vi) Unity and Eve were prototypes not suitable for commercial flight; (vii) Unity and Eve were designed to fly a few test flights and then serve as resources for the Company to design its own shuttles; therefore, (viii) Unity was not designed to fly either humans or payloads to space; (ix) the Company did not know Unity and Eve's configuration; (x) the Company did not "upgrade" the horizontal stabilizers but rather replaced them with new stabilizers that were necessary because the horizontal stabilizers had been irreparably damaged on the previous flight; (xi) because they were made of aluminum rather than composite, the new horizontal stabilizers were inferior to the original stabilizers; (xii) Defendants' statements were misleading without disclosure of (i)-(xi) because they materially conflicted with the impression reasonable investors would take from Defendants' statements.

110.    On November 5, 2020, the Company issued a press release ("Q3 2020 Press Release") and held an earnings call ("Q3 2020 Call") to discuss Q3 2020 highlights.  The Q3 2020 Press Release provided:

> ***Implemented upgraded flight control system and upgraded horizontal stabilizers on VSS Unity to increase performance during the boost phase of the flight profile.***

111.    The statements were misleading because: (i) the February 2019 flight had nearly

ended in disaster; (ii) on that flight, Unity's horizontal stabilizers were destroyed and took up to fourteen months to replace; (iii) the Company did not "upgrade" the horizontal stabilizers but rather replaced them with new stabilizers that were necessary because the horizontal stabilizers had been irreparably damaged on the previous flight; and (iv) because they were made of aluminum rather than composite, the new horizontal stabilizers were inferior to the original stabilizers.

112.    On the Q3 2020 Call, Defendant Moses stated:

> **The horizontal stabilizers, also known as h stabs, are the flight control surfaces on the outboard side of the booms, we've made improvements to these services**, as well as upgrading the flight control system that drives them.

113.    The statements were misleading because: (i) the February 2019 had nearly ended in disaster; (ii) on that flight, Unity's horizontal stabilizers were destroyed and took up to fourteen months to replace; (iii) the Company did not "upgrade" the horizontal stabilizers but rather replaced them with new stabilizers that were necessary because the horizontal stabilizers had been irreparably damaged on the previous flight; and (iv) because they were made of aluminum rather than composite, the new horizontal stabilizers were inferior to the original stabilizers.

114.    On the call, Defendant Colglazier stated:

> **We're going to focus on safety first, as we always do**, but we also really want to focus and ensure we get the experience just right.

115.    The statements were misleading because: (i) the February 2019 flight had nearly ended in disaster; (ii) on that flight, Unity's horizontal stabilizers were destroyed and took up to fourteen months to replace; (iii) the Company had encountered major unresolved safety problems in its first, third, fourth, and fifth powered flights to date, all of which would need to be addressed before any commercial flights; (iv) Eve developed cracks every flight, many of which

were not being fixed; (v) the Company's inspections could not detect problems; (v) in at least one instance, in Defendant Moses's presence, a Company executive told an employee not to put a potential safety hazard "on paper" so that there would be no repercussions if there was a fatal accident; (vi) the Company did not know Unity and Eve's configuration; therefore (vii) schedules were the Company's priority, not safety; and (viii) Defendants' statements were misleading without disclosure of (i)-(vii) because they materially conflicted with the impression reasonable investors would take from Defendants' statements.

116.    On February 2, 2021, Defendant Moses was quoted by *The Washington Post* regarding the February 2019 flight:

> ***"We thoroughly inspect the vehicle, updating our analysis; we update and critique our performance and make sure we're happy with the results before we go to those next flights,"*** he said. "***We take our time and make sure things are right."***

117.    The statements were misleading because: (i) the February 2019 flight had nearly ended in disaster; (ii) on that flight, Unity's horizontal stabilizers were destroyed and took up to fourteen months to replace; (iii) the Company had encountered major unresolved safety problems in its first, third, fourth, and fifth powered flights to date, all of which would need to be addressed before any commercial flights; (iv) Eve developed cracks every flight, many of which were not being fixed; (v) the Company's inspections could not detect problems; (vi) in at least one instance, in Defendant Moses's presence, a Company executive told an employee not to put a potential safety hazard "on paper" so that there would be no repercussions if there was a fatal accident; (vii) the Company did not know Unity and Eve's configuration; therefore (viii) schedules were the Company's priority, not safety; and (ix) Defendants' statements were misleading without disclosure of (i)-(viii) because they materially conflicted with the impression reasonable investors would take from Defendants' statements.

118.    On February 25, 2021, the Company held an earnings call ("Q4 2020 Call") to discuss Q4 2020 highlights.

119.    On the Q4 2020 Call, Defendant Moses stated: ***"Our safety culture is built around the principle that everyone in the company has the ability to call attention to an issue."***

120.    The statements were misleading because: (i) the February 2019 flight had nearly ended in disaster; (ii) on that flight, Unity's horizontal stabilizers were destroyed and took up to fourteen months to replace; (iii) the Company had encountered major unresolved safety problems in its first, third, fourth, and fifth powered flights to date, all of which would need to be addressed before any commercial flights; (iv) Eve developed cracks every flight, many of which were not being fixed; (v) the Company's inspections could not detect problems; (vi) in at least one instance, in Defendant Moses's presence, a Company executive told an employee not to put a potential safety hazard "on paper" so that there would be no repercussions if there was a fatal accident; (vii) the Company did not know Unity and Eve's configuration; therefore (viii) schedules were the Company's priority, not safety; and (ix) Defendants' statements were misleading without disclosure of (i)-(viii) because they materially conflicted with the impression reasonable investors would take from Defendants' statements.

121.    On July 2, 2021, Defendant Moses was interviewed on *CNBC Squawk* on the Street.   In the interview, Defendants made several statements about the Company's safety culture:

> **<u>Question</u>:** Yeah, what an exciting couple of weeks we have ahead of us. You know, I spoke to Sir Richard earlier this week when your sister company, Virgin Orbit, successfully carried satellites to orbit. And at that time, when I asked him what the game plan was for him to go to space, he said that he was waiting for the engineers to tell me when I can go to space, quote-unquote. You take that, you couple it with the FAA approval last Friday, how long has this plan been in the works?

**Defendant Moses:** Well, the plan has been in the works for quite some time because we had this test flight program going on. And as you know, we have four test flights we were planning to do. *We did our first on May 22nd. And it was excellent and it showed that we are technically ready to go. We did a lot of diligent analysis after that flight. That's the same data that we gave to the FAA. And as you mentioned, that's what the FAA used as the basis to approve our commercial license going forward. And when we finished that analysis, we knew we would be pivoting from focus on the technical side of the flight test to the focus on the cabin experience and what the astronaut experience would be like for these next two flights.* But we had to wait until the technical work was done and Richard was pretty patient about that.

So then as we shift this focus to now the private astronaut experience and the cabin environment, these next two test flights are pretty much going to be the same. We originally had thought we would maybe rehearse and have somebody stand-in for Richard just to kind of show what would be going on. We realized most of that training is done on the ground and so, had a chance to say to Richard, you could go on either of these two flights, which would you prefer? You can kind of imagine what he had to say back. And he's excited to go now that it's ready.

\*   \*   \*

**Question:** Safety, it's of the utmost importance. How are you planning for that? What does that look like?

**Defendant Moses**: *I would say safety is built in at the foundation of everything we do. And, you know, you mentioned we were originally planning to fly Richard well back like a year ago, and we had more test flights to do, we have more efforts to go, and so we never really worry about the schedule driving anything. We worry about our technical readiness driving everything. And so that's how this company works, that's how we're built, that's where we're embedding in the culture of this. So now that the technical readiness is there and it's there because of the data that shows it's there, and it's there because of the diligence of the team that works on this so hard.* So now that that is ready, it does really give us the ability to focus on the next phase, the cabin experience. And now we're going to get repetition and repeating under our belt on the technical flights. The last flight in May flew just as we wanted it to go so we're just going to keep doing that flight profile and move forward. But this takes us another step to opening the door of making space accessible for far more people than has ever been possible and that's pretty exciting.

122.   The statements were misleading because: (i) the February 2019 flight had nearly ended in disaster; (ii) on that flight, Unity's horizontal stabilizers were destroyed and took up to

fourteen months to replace; (iii) the Company had encountered major unresolved safety problems in its first, third, fourth, and fifth powered flights to date, all of which would need to be addressed before any commercial flights; (iv) Eve developed cracks every flight, many of which were not being fixed; (v) the Company's inspections could not detect problems; (vi) in at least one instance, in Defendant Moses's presence, a Company executive specifically told an employee not to put a potential safety hazard "on paper" so that there would be no repercussions if there was a fatal accident; (vii) the Company did not know Unity and Eve's configuration; (viii) schedules were the Company's priority, not safety; (ix) Unity was not "technical[ly] read[y]" to fly to space; (x) Defendants' statements were misleading without disclosure of (i)-(viii) because they materially conflicted with the impression reasonable investors would take from Defendants' statements.

123.    On July 11, 2021, the Company published a press release regarding Unity's first full crewed space flight, on which Branson was a passenger. The press release quoted Defendant Colglazier as saying:

> ***Today is a landmark achievement for the Company and a historic moment for the new commercial space industry. With each successful mission we are paving the way for the next generation of astronauts.*** I want to thank our talented team, including our pilots and crew, whose dedication and commitment made today possible. They are helping open the door for greater access to space – so it can be for the many and not just for the few.

124.    Defendants' statements were misleading because: (i) Unity had strayed from its vertical glide cone and FAA airspace for a substantial portion of the flight; (ii) straying was a mishap under FAA regulations; and, therefore, (iii) the July 11 flight was not successful; (iv) Unity and Eve were prototypes not suitable for commercial flight; (v) the Company did not know Unity and Eve's configuration; therefore (vi) even if the flight had proven something about Unity, it would not advance the goal of taking customers to space; and (vii) Defendants'

statements were misleading without disclosure of (i)-(vi) because they materially conflicted with the impression reasonable investors would take from Defendants' statements.

125.    That same day, Defendant Colglazier appeared on *Bloomberg Markets' The Close*.  Defendant Colglazier stated:

> **Question:** A lot of the event was about Richard, you know, Richard was front and center, but you know, as the CEO of the commercial business, what does today represent for you? What does it allow you to do?
>
> **Defendant Colglazier:** Well, two things. I think for the world, it allows us to show that something people never thought was gonna happen in their lifetimes is actually happening now. ***The ability for regular people to be able to go to space and it will take years to really get the scale of it up but I think we showed today what that is going to be like and a taste of that going forward.*** So that was huge. And then at a business level, this was one of the remaining flight tests that we need to do as we move into commercial service. So we've got two more. ***This one was perfect***
>
> \*    \*    \*
>
> **Question:** Was Sunday's event about selling tickets? Was that really what it was about?
>
> **Michael Colglazier:** ***This event was about showcasing to the world what this Virgin Galactic experience is going to be. And this event was part of our incredible safety diligent program to make sure that we go step-by-step so that when we do open this up for commercial service, we've done all that needs to be done.  So it's amazing and anchored in safety experience and that's what today was about.***

126.    Defendants' statements were misleading because: (i) Unity had strayed from its vertical glide cone and FAA airspace for a substantial portion of the flight; (ii) straying was a mishap under FAA regulations; and, therefore, (iii) the July 11 flight was not successful; (iv) Unity and Eve were prototypes not suitable for commercial flight; and, therefore (v) even if the flight had proven something about Unity, it would not advance the goal of taking customers to space; (vi) Eve developed cracks every flight, many of which were not being fixed; (vii) the Company's inspections could not detect problems; (viii) in at least one instance, in Defendant

Moses's presence, a Company executive told an employee not to put a potential safety hazard "on paper" so that there would be no repercussions if there was a fatal accident; (ix) Unity was in no condition to fly in July 2020 because the Company was still trying to install parts necessary for flight; (x) the Company did not know Unity and Eve's configuration; therefore (xi) schedules were the Company's priority, not safety; and (xii) Defendants' statements were misleading without disclosure of (i)-(x) because they materially conflicted with the impression reasonable investors would take from Defendants' statements.

127. *Bloomberg Markets* also interviewed Defendant Branson:

**Question:** Well, what does it mean for the company? There was some risk involved. I'm sure that some of your staff looking at me right now were nervous at points.

**Defendant Branson:** *Well, look, the company is 17 years, they've had a number of flawless flights. They've never had any major, major technical issues even, you know, in the last 17 years and this was absolutely and utterly flawless.*

128. The statements were misleading because: (i) the February 2019 flight had nearly ended in disaster; (ii) on that flight, Unity's horizontal stabilizers were destroyed and took up to fourteen months to replace; (iii) the Company had encountered major unresolved safety problems in its first, third, fourth, and fifth powered flights to date; (iv) Eve developed cracks every flight, many of which were not being fixed; (v) the Company's inspections could not detect problems; (vi) in at least one instance, in Defendant Moses's presence, a Company executive told an employee not to put a potential safety hazard "on paper" so that there would be no repercussions if there was a fatal accident; (vii) the Company's test program had already killed four people; (viii) Unity had strayed from its vertical glide cone and FAA airspace for a substantial portion of the flight; (ix) straying was a mishap under FAA regulations; and, therefore, (x) the July 11 flight was not successful; Defendants' statements were misleading without disclosure of (i)-(viii)

because they materially conflicted with the impression reasonable investors would take from Defendants' statements.

## DUTIES OF THE DIRECTOR DEFENDANTS

129.    By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants (defined below) owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

130.    Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

131.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and

disseminating truthful and accurate statements to the investing public and all appropriate governmental regulators;

(b)        conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)        properly and accurately state the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)        remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)        ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)        ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

132.    Each Director Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith,

42

and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

133.    The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue inaccurate and untruthful information concerning the business results and prospects of the Company. As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

## DAMAGES TO THE COMPANY

134.    As a direct and proximate result of Defendants' misconduct, the Company has lost and will continue to lose and expend many millions of dollars.

135.    Such expenditures include legal fees associated with the Securities Class Action filed against the Company and Defendants Branson, Palihapitiya, Whitesides, Moses, and Colglazier.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

136.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Director Defendants.

137.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

138.    During the illegal and wrongful course of conduct at the Company and to the present, the Board consisted of Defendants Colglazier, Austin, Bain, Jonas, Kreeger, Lovell, Mattson, and West (collectively, the "Director-Defendants") along with nonparty Wanda Sigur (collectively, with the Director-Defendants, the "Directors").  Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

139.    The Director Defendants either knew or should have known of the inaccurate and untruthful information that was issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

140.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

141.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

142.    Each of the Director Defendants authorized and/or permitted the inaccurate and untruthful information to be disseminated directly to the public and made available and

44

distributed to shareholders, authorized and/or permitted the issuance of various types of inaccurate and untruthful information, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

143.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

144.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the conduct they engaged in knowingly or recklessly to make and/or cause the Company to engage in the misconduct described above and to make false and misleading statements and omissions of material fact about the same while two of them engaged in insider sales based on material nonpublic information.

**Defendant Colglazier**

145.    Defendant Colglazier has served as the CEO of the Company and as a director, since July 2020. The Company provides Defendant Colglazier with his principal occupation for which he receives substantial compensation.

146.    As the Company admits, Defendant Colglazier is a non-independent director. Further, as CEO, Defendant Colglazier is ultimately responsible for the Company's engagement in the conduct described herein and many of the false and misleading statements and omissions that were made.  Moreover, Defendant Colglazier is a defendant in the Securities Class Action.

147.    For these reasons, Defendant Colglazier breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

**Defendant Austin**

148.    Defendant Austin has served as a Company director since October 2019. Defendant Ausitn also serves as Chairperson of the Compensation Committee and a member of both the Audit Committee and Safety Committee.

149.    Defendant Austin conducted little, if any, oversight regarding the above lack of safety and made false and misleading statements, consciously disregarded her duties to monitor such controls over reporting, and consciously disregarded her duties to protect corporate assets.

150.    For these reasons, Defendant Austin breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

**Defendant Jonas**

151.    Defendant Jonas has served as a Company director since June 2021 and also serves as a member of the Audit Committee.  Defendant Jonas conducted little, if any, oversight of the schemes to cause the Company to engage in the above-mentioned conduct, consciously disregarded her duties to monitor such controls over reporting, and consciously disregarded her duties to protect corporate assets.

**Defendant Kreeger**

152.    Defendant Kreeger has served as a Company director since October 2019. Defendant Kreeger also serves as Chairperson of the Safety Committee and as a member of the Audit Committee.

153.    Defendant Kreeger conducted little, if any, oversight of the schemes to cause the Company to engage in the above-mentioned conduct, consciously disregarded his duties to

monitor such controls over reporting, and consciously disregarded his duties to protect corporate assets.

154.    Further, Defendant Kreeger engaged in a lucrative insider transaction executed during the Relevant Period, when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein.  Therefore, demand in this case is futile as to Defendant Kreeger, and excused.

**Defendant Bain**

155.    Defendant Bain fills a directorship in the Company over which Defendant Palihapitiya retains a right to designate the officeholder.  Thus, Defendant Bain is beholden to Defendant Palihapitiya, another primary interested wrongdoer.

156.    Defendant Bain conducted little, if any, oversight regarding the above lack of safety and made false and misleading statements, consciously disregarded her duties to monitor such controls over reporting, and consciously disregarded her duties to protect corporate assets.

**Defendant Lovell**

157.    Defendant Lovell has served as a Company director since October 2019.  Further, Defendant Lovell serves as Interim Chairperson of the Board following Defendant Palihapitiya's resignation, and as a member of the Safety Committee, Defendant Lovell fills one of three directorships in Virgin Galactic for which Vieco US retains a right to designate the officeholder. Defendant Lovell is therefore beholden to Defendant Branson, a primary wrongdoer, who controls Vieco US through Virgin Group Holdings Limited.  Given Defendant Lovell's relationship with Defendant Branson and Virgin Group Holdings Limited—where he is a Partner—the Company admits he is not an independent director.

158.     Defendant Lovell conducted little, if any, oversight regarding the above lack of safety and made false and misleading statements, consciously disregarded his duties to monitor such controls over reporting, and consciously disregarded his duties to protect corporate assets.

**Defendant Mattson**

159.     Defendant Mattson has served as a Company director since October 2019. Further, Defendant Mattson serves as a member of the Safety Committee.

160.     Defendant Mattson occupies one of three directorships in Virgin Galactic for which Vieco US retains a right to designate the officeholder.  Defendant Mattson is therefore beholden to Defendant Branson, a primary interested wrongdoer, who controls Vieco US through Virgin Group Holdings Limited.

161.     Defendant Mattson conducted little, if any, oversight regarding the above lack of safety and made false and misleading statements, consciously disregarded his duties to monitor such controls over reporting, and consciously disregarded his duties to protect corporate assets.

**Defendant West**

162.     Defendant West has served as a Company director since February 2021. Defendant West conducted little, if any, oversight regarding the above lack of safety and made false and misleading statements, consciously disregarded his duties to monitor such controls over reporting, and consciously disregarded his duties to protect corporate assets.

**Defendants Kreeger, Lovell and Mattson**

163.     Defendants Kreeger, Lovell, and Mattson are beholden to and controlled by Defendant Branson, a primary interested wrongdoer who was a controlling shareholder during the Relevant Period.

164.    Defendant Branson exercised control over 58.7% of the Company's common stock immediately following the merger, which made him a controlling shareholder.

**Defendants Lovell and Kreeger Long Standing Relationship**

165.    Defendants Lovell and Kreeger are or were executives within the greater "Virgin" brand, owned by Defendant Branson.  Defendant Lovell is a Partner at Virgin Group Holdings Limited and has been since October 2012.  He serves on the Board of numerous of its subsidiaries.

166.    Defendant Kreeger was CEO of Virgin Atlantic from February 2013 until December 2018, before joining the Board of the Company in October 2019.

**Defendants Whitesides and Moses Long Standing Relationship**

167.    Defendants Whitesides and Moses also have longstanding relationships with the greater "Virgin" organization, as both were employed by Legacy VG starting in 2010 and 2011, respectively.

**Defendants Austin, Jonas, Kreeger and Mattson**

168.    Defendants Austin, Jonas, Kreeger, and Mattson served as members of the Audit Committee during the Relevant Period.  Defendants Austin, Jonas, Kreeger, and Mattson failed to adequately (i) review and discuss the Company's Forms 10-K, Forms 10-Q, and quarterly earnings press releases; (ii) exercise their risk management and risk assessment functions; and (iii) ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct.  Defendants Austin, Jonas, Kreeger, and Mattson therefore breached their fiduciary duties, are not disinterested, and demand is excused as to them.

**Defendants Austin, Kreeger, Lovell and West**

169.    Defendants Austin, Kreeger, Lovell and West served as members of the Safety Committee during the Relevant Period.  In violation of the Safety Committee Charter, the Safety Committee Directors caused and/or permitted the Company to engage in the conduct described herein.  In addition, the Safety Committee Directors failed to adequately (i) review the status of the Company's safety performance; (ii) review and provide input regarding safety issues; (iii) assist the Board with oversight of risk management and security processes; (iv) review the annual strategy and resources of the Company's safety organization; (v) review the Company's safety policies, systems, and benchmarks against industry standards; (vi) review processes designed to mitigate key safety risks; (vii) review methods used to communicate the Company's core safety values; (viii) review periodic updates on significant safety policy issues in key countries of operation that may materially impact the Company's operations and review management's annual update on the same; (ix) review safety audit results, findings, and action plans; and make periodic visits to the Company's facilities and discuss safety issues related to those facilities.  Defendants Austin, Kreeger, Lovell and West breached their fiduciary duties, are not disinterested, and demand is excused as to them.

## COUNT I

### (Against Defendants For Breach Of Fiduciary Duty)

170.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

171.    Defendants owed the Company fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

172.    Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

173.    Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the public and to the Company's shareholders, allowing or permitting inaccurate and untruthful information to be disseminated in the Company's SEC filings and other public disclosures and, otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

174.    As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

175.    As a direct and proximate result of Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending and/or settling the securities lawsuit, severe damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## COUNT II

### (Against Defendants For Waste Of Corporate Assets)

176.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

177.    The wrongful conduct alleged regarding the issuance of inaccurate and untruthful information was continuous, connected, and on-going throughout the time period in issue.  It resulted in continuous, connected, and ongoing harm to the Company.

178.    As a result of the misconduct described above, Defendants wasted corporate assets by, *inter alia*: (a) paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (b) awarding self-interested stock options to certain officers and directors; and (c) incurring potentially millions of dollars of legal liability and/or legal costs to defend and/or settle actions addressing Defendants' unlawful actions.

179.    As a result of the waste of corporate assets, Defendants are liable to the Company.

180.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

### COUNT III

### (Against Defendants For Unjust Enrichment)

181.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

182.    By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, Defendants were unjustly enriched at the expense of, and the detriment of, Virgin Galactic.

183.    Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Virgin Galactic that was tied to the performance of Virgin Galactic or its stock price or received compensation or other payments that were unjust in light of Defendants' bad faith conduct.

184.    Plaintiff, as a shareholder and representative of Virgin Galactic seek restitution from Defendants and seek an order from this Court disgorging all profits, including from insider

transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

185.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## COUNT IV

### Against Defendants Branson, Palihapitiya, Whitesides, Moses and Colglazier for Contribution Under Sections 10(b) and 21D of the Exchange Act

186.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

187.    Defendants Branson, Palihapitiya, Whitesides, Moses, and Colglazier are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.  If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Branson's, Palihapitiya's, Whitesides's, Moses's, and Colglazier's willful and/or reckless violations of their obligations as controlling shareholder, officers, and/or director of the Company.

188.    Accordingly, Defendants Branson, Palihapitiya, Whitesides, Moses, and Colglazier are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

189.    As such, the Company is entitled to receive all appropriate contribution or indemnification from Defendants Branson, Palihapitiya, Whitesides, Moses, and Colglazier.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Against Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.    Awarding to the Company restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury on all issues so triable.

Dated: March 1, 2022

**GAINEY McKENNA & EGLESTON**

By: */s/ Thomas J. McKenna*
    Thomas J. McKenna
Gregory M. Egleston
501 Fifth Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

***Attorneys for Plaintiff***

**VERIFICATION**

I, LISA GRENIER, have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing.  To those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of Virgin Galactic Holdings, Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this __24__ day of February 2022.

LISA GRENIER